UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AUDREY LEE OTT,                         CASE NO. 1:20-CV-13248

   *Plaintiff,*                    HON. THOMAS L. LUDINGTON
*v.*                                   DISTRICT JUDGE

COMISSIONER OF SOCIAL                  HON. PATRICIA T. MORRIS
SECURITY,                              MAGISTRATE JUDGE

   *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 17, 18)

### I.  RECOMMENDATION

   Plaintiff Audrey Lee Ott challenges the Commissioner of Social Security regarding a final decision denying her claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (ECF No. 1; ECF No. 8, PageID.349-57.)  The case was referred to the undersigned for review.  (ECF No. 2); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3).  For the reasons below, I conclude that substantial evidence supports the Commissioner's decision.  Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 17), **GRANTING** the Commissioner's motion, (ECF No. 18), and affirming the decision.

II.   **REPORT**

### A.  Introduction and Procedural History

Plaintiff's application for SSI and DBI was protectively filed on July 17, 2017. (ECF No. 8, PageID.68, 349-55, 181.)  She alleged that she became disabled on January 1, 2018.  (*Id*. at PageID.68.)[1]  The Commissioner denied the claim on February 23, 2018. (*Id*. at PageID.183.)  Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on October 10, 2019.  (*Id*. at PageID.89.)  The ALJ issued a decision on February 20, 2020, finding that Plaintiff was not disabled.  (*Id*. at PageID.82.)  The Appeals Council denied review on October 5, 2020.  (*Id.* at PageID.42.)  Plaintiff sought judicial review on December 10, 2020.  (ECF No. 1.)  The parties filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 17, 18.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not

---

[1] Plaintiff's original alleged onset date was September 9, 2011, (ECF No. 8, PageID.351), but was amended after her hearing before the ALJ to the January 1, 2018 date.

high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a

combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could

perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486

F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was

not disabled. (ECF No. 8, PageID.82.)  At step one, the ALJ found Plaintiff had not engaged

in substantial gainful activity since the alleged onset date of January 1, 2018.  (*Id.* at

PageID.71.)  At step two, the ALJ concluded that Plaintiff had the following severe

impairments: degenerative disc disease of the cervical spine with nerve root impingement,

right shoulder pain of unclear etiology, fibromyalgia, hypothyroidism, chronic pain

syndrome, chronic obstructive pulmonary disease ("COPD"), osteoarthritis of the bilateral

knees, headaches, liver cyst, irritable bowel syndrome, major depressive disorder,

generalized anxiety disorder, and cannabis use disorder.  (*Id.*)  None of these impairments

met or medically equaled a listed impairment at step three.  (*Id.*)  Next, the ALJ found that

Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 416.1567(b) and 416.967(b)
> except she can occasionally climb ladders, ropes, and scaffolds. She can do
> frequent stooping, kneeling, crouching, and crawling. She can perform
> occasional overhead reaching with the right arm. She can have no exposure
> to extreme cold. She can tolerate frequent exposure to environmental
> pollutants such as dust, fumes, and smoke. She cannot work around hazards
> such as unprotected heights and unguarded/uncovered moving machinery.
> She can carry out simple instructions. She cannot work at a production rate
> pace, such as assembly line work. She cannot interact with the general public.
> She can frequently interact with supervisors and coworkers.

(*Id.* at PageID.74.) At step four, the ALJ found that Plaintiff is unable perform any past

relevant work.  (*Id.* at PageID.79.)  Finally, at step five, the ALJ determined that Plaintiff

could perform a significant number of jobs in the national economy, including work as an electrical accessories assembler, housekeeper, or inspector, hand packager.  (*Id.* at PageID.81-82.)  Accordingly, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at PageID.82.)

### E.  Administrative Record

#### i.     Medical Evidence

A state agency medical examination dated February 20, 2018, (ECF No. 8, PageID.163), by a J. Ordman, M.D. and James Tripp, Ed.D., (*Id.* at PageID.161), noted that Plaintiff showed "5/5 strength" bilaterally, normal gait, and a bilateral C6-7 radiculopathy that was "mildly severe", and neck and right shoulder pain secondary to "severe C6 nerve root impingement." (*Id.* at PageID.152.) Plaintiff could "ambulate symmetrically without any evidence of gross weakness or instability." (*Id.*) Plaintiff's affect was "appropriate to mood, she was cooperative, she denied paranoid or grandiose delusions, claim[ed] suicidal thoughts" but had "no plans," and "claim[ed] feelings of helplessness and hopelessness." (*Id.* at PageID.152.) The exam noted Plaintiff's severe impairments as "spine disorders" and "anxiety and obsessive-compulsive orders," primary and secondary impairments, respectively, and "COPD" and "migraine" as non-severe impairments. (*Id.* at PageID.154.)

A consultative examination performed by Lasmi Manyam, M.D., and dated November 29, 2017, provided the following. (ECF No. 8, PageID.892.) Plaintiff had mild COPD with no acute exacerbation or hospitalization; she had increased tiredness and

fatigue; a history of headaches that was "controlled with Fioricet; neck pain and mild arthritis; no radiculopathy; degenerative disc disease and lower back pain; right and left knee pain with mild osteoarthritis; a history of fibromyalgia but no significant joint tenderness; and a history of insomnia due to depress and anxiety. (*Id*. at PageID.891.) The exam concluded that Plaintiff's fine and gross dexterity was intact, she had no problems lifting or carrying except a slight limitation on heavy lifting or climbing due to her knee pain and COPD. (*Id.*)

### ii.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified at the October 10, 2019 hearing. (ECF No. 8, PageID.91.) The ALJ first noted that although there was a prior determination in a previous application that Plaintiff was not disabled, he acknowledged that he was "not bound by that prior determination" and instead was there to "make a new independent decision on whether [Plaintiff was or was not] disabled." (*Id*.) The ALJ asked Plaintiff several questions. Plaintiff was 50 years old at the time of the hearing and had completed two years of college education. She lived with a friend. (*Id*. at PageID.93-94.) Plaintiff confirmed that she had not worked since September 2011. (*Id*. at PageID.94.)

The ALJ invited Plaintiff's counsel to ask her some questions. Counsel first asked Plaintiff what her "major problem" was that kept her from working. Plaintiff responded that her thyroid almost "killed [her]" and noted that she was diagnosed with bipolar disorder. (*Id*. at PageID.94.)

When asked about her previous job as a corrections officer, Plaintiff testified that she was "mostly standing" and would only sit for a few hours during her shift. (*Id*. at PageID.94-95.)

Then Plaintiff discussed her symptoms from her bipolar disorder—she sometimes did not want to get out of bed, would not shower for three to four days, experienced "absolute rage," and stated that it was difficult for her to stay focused. (*Id*. at PageID.95.) Counsel asked what symptoms she experienced from her fibromyalgia—Plaintiff responded, "a big one is fatigue." (*Id*.) In addition, she experienced pain "all over," but mainly in her knee. (*Id*.) This pain affected her ability to walk, squat, and bend. (*Id*.) Plaintiff experienced these symptoms approximately four times a week. (*Id*. at PageID.96.) She was prescribed Lyrica for her fibromyalgia, and while it did not provide "full relief," it did "take the edge off[.]" (*Id*.)

Counsel then asked Plaintiff about her thyroid. (*Id*.) She testified that if she doesn't have enough "medication" "in her system" her thyroid is not stable, it goes up and down, and if it's too low, she will go into a myxedema coma. (*Id*. at PageID.96-97.) This has led Plaintiff to get lost in a K-mart and crash her car on two occasions. (*Id*. at PageID.97.) On the other hand, Plaintiff explained, if she had too much medication she became "extremely anxious," and "wired." (*Id*. at PageID.97.) She would have to take Xanax to avoid having a panic attack. (*Id*.)

Plaintiff testified that she had migraines three to four times per week. (*Id*.) When she had a migraine, she would take ibuprofen or Topamax, lie down in bed, close the curtains, and put a cold towel over her face. (*Id*.) She said that the migraines were

"debilitating" and that she could not function "at all." (*Id*. at PageID.98.) The medication helped to relieve some of the pain but was not "100 percent effective." (*Id*.) Plaintiff testified that stress often brought on her migraines. (*Id*.)

Counsel then asked Plaintiff about a traumatic event she experienced in 2018. (*Id*.) On October 11, 2018, Plaintiff entered the restroom and discovered that her fiancé, on the floor, had passed away. (*Id*.)

After this incident, Plaintiff was diagnosed with microscopic colitis and irritable bowel syndrome. (*Id*. at PageID.99.) At the time of the hearing she was being treated for these conditions and was taking medication. (*Id*.) Plaintiff also suffered from asthma and COPD and experienced shortness of breath. (*Id*.) She was "on oxygen" and used a nebulizer at night. (*Id*. at PageID.100.) In addition, Plaintiff testified that she had a herniated disk in her back at L4 and L5 but was not a candidate for surgery. (*Id*. at PageID.101.) The herniated disk made it hard for Plaintiff to sit for long periods of time, which she defined as forty-five minutes to one hour; she could stand for twenty minutes to a half an hour. (*Id*.)

Plaintiff talked about her day-to-day routine. She lived with a male friend at that time. (*Id*. at PageID.101-02.) During the day she would talk on the phone with her friends, do the dishes, grocery shop, and sometimes do the laundry. (*Id*. at PageID.102.) She said she did not spend time reading as a hobby because she could not concentrate. (*Id*.)

Counsel asked Plaintiff about her mental health. Plaintiff was diagnosed with severe depression and said that it caused her "to not want to get out of bed." (*Id*.) She didn't want to see anybody, talk to anybody, shower, or do anything—she only wanted to be left alone, and she would cry very easily. (*Id*. at PageID.102-03.) She experienced these symptoms

"eight to maybe ten days" per month. (*Id.* at PageID.103.) But, she clarified, it could also last for an entire month or more— "it's not one set thing," she explained. (*Id.*)

Plaintiff did not generally cook her own meals, she did not watch television during the day, and she did not sleep well at night, so she often napped during the day. (*Id.*) She said that she is fatigued "every day." (*Id.* at PageID.104.)

Next, the ALJ questioned Plaintiff. (*Id.* at PageID.105.) Plaintiff said that she does not do well in groups of people because of her anxiety and is not comfortable around even five people in the same room. (*Id.*) She said that she could manage one-on-one interactions. (*Id.* at PageID.106.)

### iii.    The Vocational Expert's Testimony at the Administrative Hearing

Next, the ALJ questioned the vocational expert ("VE"). (*Id.* at PageID.106-07.) The VE classified Plaintiff's past work as corrections officer, Dictionary of Occupational Title ("DOT") code 372.667-018, semi-skilled, level 4, medium exertional level performed as medium. (*Id.* at PageID.108.)

The ALJ posed the following hypothetical individual:

This person can perform work at the sedentary exertion level. This person can occasionally climb ladders, ropes and scaffolds, stoop, kneel, crouch, and crawl. This person can frequently climb stairs and ramps, and balance. This person can occasionally reach overhead, with the right arm. For every 30 minutes of sitting, standing, or walking, the person must change position for three minutes before resuming the prior position. This person can never tolerate exposure to extreme cold, or work around hazards such as unprotected heights or unguarded, uncovered moving machinery. This person can tolerate frequent exposure to environmental pollutants such as dust, fumes, and smoke. This person can carry out simple instructions. This person can never interact with the general public. This person can frequently

interact with supervisors and coworkers. All social interactions must be on a one-to-one basis.

(*Id.* at PageID.108.) The ALJ noted that this individual would also have the same age and educational experience as Plaintiff. The ALJ asked whether such an individual would be able to do any of Plaintiff's past work. (*Id.* at PageID.108-09.) The VE responded that such an individual could perform Plaintiff's past relevant work. (*Id.* at PageID.109.)

The VE also noted, though, that other work would be available to such an individual, too. (*Id.*) Such jobs would include: document preparer, DOT code 249.587-018, sedentary, unskilled, level 2, where the individual could stand every thirty minute or "as they choose," 41,500 jobs available; optical assembler, DOT code 713.687-018 sedentary, unskilled, level 2, the individual would be able to stand for three minutes every thirty minutes, 40,400 jobs available; or printed circuit board inspector, DOT code 726.684-110, sedentary, unskilled, level 2, the individual would be able to stand for three minute intervals every thirty minutes; 28,700 jobs available. (*Id.*)

The VE clarified that his testimony was consistent with the DOT except as to reaching overhead with only one, right extremity or standing for three minutes every thirty minutes, which the DOT does not address. (*Id.* at PageID.109-10.)

Next, the ALJ asked the VE to assume a hypothetical individual with the same limitations as before, but who would be off-task 20 percent of the day, would miss two days of work per month, could not carry out even simple instructions, and could never interact with supervisors or coworkers. (*Id.* at PageID.110.) The VE responded that these additional limitations would eliminate any competitive employment and noted that any of

the limitations independently would be work preclusive. (*Id.*) The VE noted that these examples were not addressed by the DOT and were based on his own experience. (*Id.*)

Counsel for Plaintiff asked whether the VE's opinion would change at all if the hypothetical individual was off-task 15 percent of the day instead of 20 percent—and VE answered that it would not, and such a limitation would still be work preclusive. (*Id.* at PageID.110-11.) Counsel asked if there was any job an individual could maintain if they were absent two or more times per month. (*Id.* at PageID.111.) The VE responded that while the DOT did not cover absenteeism, in his experience, employers would not tolerate an employee who was absent more than once per month, assuming it is unscheduled and without a supervisor's approval or knowledge. (*Id.*)

**F.  Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same

function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources

in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical

finding." *Id.* § 404.1520c(c)(5).  "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation."  Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.*  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c).  The regulations categorize evidence that is inherently

neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)   Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)  Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will,

however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the

symptoms affect your activities of daily living and your ability to work[.]"   *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."   *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you."   *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work."   *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms."   *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may

precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]"  *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

> (i)     [D]aily activities;
>
> (ii)    The location, duration, frequency, and intensity of . . . pain;
>
> (iii)   Precipitating and aggravating factors;
>
> (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)     Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."  *Id.* § 404.1530(a).  Stated differently, "[i]f you

do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

#### i. Step Three Determination

Plaintiff argues that the ALJ's step three determination was not supported by substantial evidence; specifically, Plaintiff avers that she has severe difficulties in concentration, persistence, or pace. (ECF No. 17, PageID.1209-10.) She argues that she has a combination of impairments that meet or equal an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.* at PageID.1210.) However, to the extent that Plaintiff sets forth that "she has severe difficulties" in concentration, persistence, or pace, she supports

this assertion by referring briefly to her inability to "follow simple instructions, concentrate," and "handle stress and changes in routine." (*Id*. at PageID.1209-10.)

In response, Defendant argues that the ALJ reasonably determined Plaintiff's impairments did not meet or medically equal a listing in Appendix 1. It argues that the ALJ found Plaintiff had moderate restrictions in understanding, remembering, or applying information, as well as interacting with others, maintaining concentration, persistence, and pace, and had mild limitations in adapting/managing herself. (*Id*. at PageID.1224-25.) Defendant points out that Plaintiff "fails to identify what listing her combination of impairments allegedly meet or medically equal" a listing. (*Id*. at PageID.1225.)

Defendant elaborates, "[t]he only attempt that Plaintiff makes to support her argument is by claiming that she had severe difficulties in maintaining concentration, persistence, or pace (ECF No. 17, PageID.1209). This assertion suggests that Plaintiff is arguing that her combination of impairments meets or medically equals a mental health listing under Section 12.00." (ECF No. 18, PageID.1226.) Defendant points out that "to show that her impairment meets or medically equals a mental listing, Plaintiff would need to establish an extreme limitation in this category, as '[t]o satisfy the paragraph B criteria, [her] mental disorder must result in extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning.'" (*Id*. citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F2.)

As Defendant points out,

Here, the ALJ found that Plaintiff had a moderate restriction in maintaining concentration, persistence, or pace (ECF No. 8, PageID.73). The ALJ noted that

> Plaintiff had alleged limitations in concentration generally, as well as in watching television, reading, focusing generally, and completing tasks (ECF No. 8, PageID.73 citing ECF No. 8, PageID.95, 98, 102, 405). However, the ALJ also concluded that the record showed that Plaintiff could drive, prepare simple meals, watch television, pay bills, count change, handle a simple account, and use a checkbook (ECF No. 8, PageID.73 citing ECF No. 8, PageID.402, 403, 404).

(ECF No. 18, PageID.1226.)

I suggest that this argument has merit. Indeed, in the Step Three analysis section of his written opinion—as far as Plaintiff's mental impairments are concerned, which are all that she raised—the ALJ noted that he must find that the "paragraph B" criteria of listings 12.04 and 12.06 are met. (ECF No. 8, PageID.72.) This requires, the ALJ acknowledged, that "the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning." (*Id.*) As the ALJ noted, an extreme limitation is "the inability to function independently, appropriately, or effectively, and on a sustained basis." (*Id.*) And a marked limitation is "a seriously limited ability to function independently, appropriately, or effectively, on a sustained basis." (*Id.*)

Plaintiff only raises issues concerning the analysis of her ability to concentrate, persist, or maintain pace. (ECF No. 17, PageID.1209-10.) The ALJ considered Plaintiff's abilities to perform these actions considering the evidence of her impairments. The ALJ found that Plaintiff had moderate limitations; he wrote that she alleged limitations watching television, reading, completing tasks, and focusing in general. (ECF No. 8, PageID.73.) "On the other hand," the ALJ continued, "the claimant said that she is also able to drive, prepare simple meals, watch television, pay bills, count change, handle a savings account, and use a checkbook." (*Id.*)

I suggest that the ALJ did not err in his analysis on this point. The conclusion that she had some limitation in this regard, but not a marked or extreme limitation, is supported by the substantial evidence—indeed, it is even supported by Plaintiff's own testimony. While Plaintiff testified to having some difficulty reading, watching television, or focusing, she also testified to her ability to pay bills, cook simple meals, and talk with her friends and family, among other things. (ECF No. 8, PageID.102.) This testimony alone establishes that she had less than "a seriously limited ability to function independently, appropriately, or effectively, on a sustained basis." (*Id.*) In addition, the opinions of the consulted medical experts also found that Plaintiff showed a "moderate" limitation in concentration, persistence, and pace, and "mild" limitations in the other categories. (ECF No. 8, PageID.154.) Further, the suggested mental RFC from that medical report showed only a moderate limitation in "the ability to carry out detailed instructions" and was "not significantly limited" in the other categories. (*Id.* at PageID.159) (referring exclusively to the concentration, persistence, and pace categories.) I suggest the ALJ's determination was supported by substantial evidence and that he did not err in the Step Three analysis.

### ii.  Plaintiff's RFC

Plaintiff also argues that her medically determinable impairments do not conflict with her testimony at the hearing. (*Id.*) Plaintiff complains that the ALJ failed to properly evaluate her pain "relative to the intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] work related activities," (ECF No. 17, PageID.1210.)

Plaintiff sets forth the following in support of her argument. An August 2017 nerve conduction and EMG showed lumbar radiculopathy and an August 2016 MRI of her cervical spine showed "severe right neural foramina stenosis at C5-C6" as well as "a right lateral herniated nucleus pulposus causing severe impingement of the right C6 nerve root[.]" (*Id*.) Plaintiff argues that this medical evidence is consistent with her complaints of neck pain, shoulder pain, and right upper extremity pain, affecting her range of motion. (*Id*.) In addition, Plaintiff raises a spirometry performed prior to December 13, 2017, that indicated a "severe obstruction, suggesting obstructive lung disease." (*Id*. at PageID.1211.)

Plaintiff also argues the ALJ failed to "consider the individual's credibility." (*Id*. at PageID1213.) In support, Plaintiff argues that SSR 96-7 provides "symptoms may not be disregarded solely because they are not sustained by medical evidence" and that objective medical evidence is only "one factor that the adjudicator must consider in assessing an individual's credibility." (*Id*.) Plaintiff argues that the ALJ erred by failing to consider the medications Plaintiff was prescribed. (*Id*.) Plaintiff also argues that she clearly meets the requirements for a finding of chronic fatigue syndrome. (*Id*. at PageID.1213-15.)

In response, Defendant argues that the ALJ properly evaluated Plaintiff's impairments and limitations in determining her RFC. (ECF No. 18, PageID.1227.) Defendant argues that the ALJ considered Plaintiff's subjective complaints of pain including her allegations of her functional limitations, medication usage, treatment, aggravating factors, and daily activities. (*Id*. at PageID.1228, citing ECF No. 8, PageID.74-75.)

Again, I suggest that Defendant's position is a more accurate portrayal of the ALJ's decision. After considering the objective and subjective evidence, the ALJ determined that Plaintiff could perform light work with several additional limitations.

The evidence considered by the ALJ included the following from Plaintiff's hearing testimony: Plaintiff reported difficulty sitting, standing, walking, lifting, squatting, bending, reaching, kneeling, climbing stairs, remembering, and concentrating. (ECF No. 8, PageID.74, citing ECF No. 8, PageID.405.) Plaintiff testified that she could sit for up to an hour and a half and could stand for up to thirty minutes. (*Id*.) She experienced "widespread pain" including in her knee, neck, back, and upper extremity as a result of fibromyalgia, degenerative disc disease, and osteoarthritis. (*Id*.) Although Plaintiff used medication for the pain it did not "resolve her symptoms." (*Id*.) She experienced migraine headaches three to four times per week. (*Id*.) The ALJ acknowledged myriad other ailments that Plaintiff testified too, including COPD, mental disorders, and more. (*Id*. at PageID.74-75.) In short, the ALJ thoroughly considered Plaintiff's hearing testimony.

However, the ALJ ultimately wrote that those allegations were not entirely consistent with the medical evidence.

The ALJ referred to many of the medical tests and reports in his opinion that Plaintiff raises in her motion. For instance, the medical evidence that the ALJ cited in support of this decision includes the following: a history of treatment for several health issues, a 2015 imaging of her lumbar spine showing mild degenerative changes, an August 2017 nerve conduction and EMG showing lumbar radiculopathy, a history of neck and

27

shoulder pain, an August 2016 MRI showing severe right neural foramina stenosis at C5-C6, a right lateral herniated nucleus, and other examination results. (*Id.* at PageID.75.)

The ALJ considered the medical consultative examination performed by Lasmi Manyam, M.D., who observed that Plaintiff could walk without difficulty, was cooperative, had intact fine and gross motor dexterity, had non-tender cervical and lumbar spine, some pian with range of motion in her right shoulder and lower back but otherwise a full range of motion, unremarkable knees, and was neurologically "intact." (*Id.*) Dr. Manyam noted that Plaintiff had a history of fibromyalgia but she "did not observe any significant joint or muscle tenderness." (*Id.* at PageID.76.)

The ALJ considered a medical report for November 2018 in which Plaintiff reported low back pain and knee pain, daily headaches that were improved with the use of Fioricet, and no new or worsening low back pain and no neck pain or pain "down her arms." The medical provider noted that Plaintiff was recommended to wear a back brace. (*Id.*)

The ALJ thoroughly summarized and reviewed years of Plaintiff's objective medical evidence for several more pages. The ALJ included analysis of a psychiatric evaluation, visits to emergency rooms with abdominal pain, diarrhea, and nausea, upper respiratory issues, and mental health examinations. (*Id.* at PageID.77-78.) Plaintiff was given medication for her stomach issues, "appeared comfortable during her examination," and "was in no acute distress." (*Id.* at PageID.78.)

The ALJ concluded that although Plaintiff experienced degenerative disc disease with radiculopathy and osteoarthritis of the knees, fibromyalgia, right shoulder pain, and

chronic pian syndrome, she was "able to manage her symptoms with medication and intermittent use of a back brace" and she "retains a normal gait, with no evidence of weakness or instability." (*Id*. at PageID.79.) The ALJ also considered the medical opinions of several professionals, including a nurse, Ms. James; Dr. Manyam; Dr. Ordman; Dr. Trip; and a Mr. Mills and a Ms. Coutu. (*Id*. at PageID.79-80.)

I suggest that the ALJ's decision was supported by substantial evidence. The ALJ considered Plaintiff's subjective complaints and compared them against the objective medical evidence in the record. In light of the evidence, the ALJ adopted several restrictions to the RFC according to the medical conditions Plaintiff complained of and that were supported by the medical evidence, such as no exposure to extreme cold, no work around hazards such as unprotected heights or moving machinery, no production rate work, and no interaction with the general public. (*Id*. at PageID.74.) While it is true that Plaintiff showed evidence of mild degenerative changes, lumbar radiculopathy, a history of neck and shoulder pain, and severe right neural foramina stenosis at C5-C6, as she argues in support of her position, the ALJ noted these findings and adjusted the RFC accordingly. (*Id*. at PageID.75.) The ALJ ultimately found that, those tests notwithstanding, the remainder of the objective medical evidence revealed several instances where Plaintiff did not have joint or muscle tenderness or was generally "comfortable." (*Id*. at PageID.78.) This Court will not reweigh this medical evidence. *Mullins v. Sec'y of Health & Human Servs*., 680 F.2d 472, 472 (6th Cir. 1982) (citing *Wokojance v. Weinberger*, 513 F.2d 210 (6th Cir. 1975)) ("Our task is not to reweigh the evidence. That is solely the province of

the Secretary."). Indeed, "substantial evidence" means to "more than a scintilla of evidence but less than a preponderance." *Rogers*, 486 F.3d at 241 (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. 1148, 1154 (2019). The ALJ considered the wealth of objective medical evidence in this case as well as Plaintiff's subjective complaints. I suggest that the ALJ did not err and that this conclusion was supported by substantial evidence.

Plaintiff also argues that the ALJ erred by failing to address Plaintiff's age as a vocational factor. (ECF No. 17, PageID.1212.) Plaintiff argues, "SSR 83.10 provides that older age is an increasingly adverse vocational factor for persons with severe impairments" and "the chronological ages 45, 50, 55, and 60 may be critical to a decision." (*Id.*) Plaintiff sets forth that although "the regulations do not provide fixed guidelines as to when a borderline situation exists," Plaintiff here was "closely approaching advanced age." (*Id.*)

However, the ALJ did consider Plaintiff's age twice; first in questioning the ALJ, and again in his written opinion. In an interrogatory to the VE, as well as in the hearing, the ALJ asked the VE to consider a person of Plaintiff's age, or in other words, who was born on the same day as Plaintiff. (*Id.* at PageID.507; 108-09.) And in his written opinion, the ALJ noted that "[Plaintiff] was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. [Plaintiff] subsequently changed age category to closely approaching advanced age." (*Id.* at PageID.81.) Thus, I suggest that the

ALJ did not err by failing to take Plaintiff's age into consideration, and this argument also fails.

Finally, Plaintiff makes several other arguments that are no more than a few cursory statements. Plaintiff argues that the ALJ erred by finding Plaintiff could perform light work. (*Id*. at PageID.1211-12.) Plaintiff sets forth that SSR 83-11 provides that a claimant must have the exertional capability and capacity to perform all or substantially all of the work existing at that level. (*Id*. at PageID.1212.) But Plaintiff does not discuss what elements of the light work designation Plaintiff could not do, or medical evidence to support such an assertion.

Plaintiff also argues, "although she had not been actively engaged in treatment with a psychologist/psychiatrist, here PCP had prescribed the following psychotropic: Abilify, Trazadone, Effexor, and Xanax." (ECF No. 17, PageID.1211.) This is all Plaintiff provides regarding mental health and does not provide an analysis regarding this statement.

It is not this "Court's function to search the administrative record for evidence to support [Plaintiff's] argument." *Marko v. Comm'r of Soc. Sec.*, No. 2:16-cv-12204, 2017 WL 3116246, at *3 (E.D. Mich. July 21, 2017) (internal quotation marks omitted); *Berry v. Comm'r of Soc. Sec.*, No. 16-10548, 2016 WL 7664225, at *11 (E.D. Mich. Dec. 8, 2016) (holding that a plaintiff waived his argument that "the ALJ could have included more restrictive limitations in his RFC assessment" by not specifying what "restrictions might be appropriate"). Therefore, I suggest that Plaintiff's arguments that she cannot perform

some elements of light work or that she was taking medication for her mental health are waived.

Similarly, Plaintiff's bare assertion that she had chronic pain syndrome should also be waived. *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 917 n.1 (6th Cir. 2021) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited].")). While she lays out the requirements for such a finding, Plaintiff does not discuss any medical evidence of her own pointing to such a finding nor does she take issue with any specific finding by the ALJ regarding chronic fatigue syndrome. What is more, the ALJ did acknowledge that Plaintiff had chronic fatigue syndrome and considered that in his analysis and even included it as a severe impairment. (ECF No. 8, PageID.71.)

And Plaintiff mentions that a prior ruling, by a different ALJ, found Plaintiff had the RFC to perform sedentary work. (ECF No. 17, PageID.1211.) However, as the ALJ correctly acknowledged, he was not bound by this prior ruling. (ECF No. 8, PageID.68-69.) Thus, this argument fails and will not be considered. ALJ's are not bound by prior findings when considering periods of disability that succeed the time period adjudicated in the earlier decision. *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931–34 (6th Cir. 2018).

## H. Conclusion

For the previously discussed reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion,

(ECF No. 17), **GRANTING** Defendant's motion, (ECF No. 18), and affirming the decision.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 3, 2022                                   S/ PATRICIA T. MORRIS
                                                        Patricia T. Morris
                                                        United States Magistrate Judge